IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES for the use & benefit of MIDSTATE EQUIPMENT, INC.; MIDSTATE EQUIPMENT, INC., | Case No. 4:19-cv-00010-JWS |
| Plaintiffs, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | |
| AHTNA CONSTRUCTION & PRIMARY PRODUCTS, LLC; GREAT AMERICAN INSURANCE COMPANY, | |
| Defendants. | |

## I.   INTRODUCTION AND STATEMENT OF JURISDICTION

This Miller Act lawsuit was tried to the court from July 12, 2021, through July 16, 2021, in Anchorage, Alaska. This court has subject matter jurisdiction pursuant to 40 U.S.C. § 3133. The parties' several state law claims also were tried. They are so related to the Miller Act claim as to form part of the same controversy. This court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

Pursuant to Federal Rule of Civil Procedure 52, the court sets out its findings of fact and conclusions of law below.

## II. FINDINGS OF FACT

1. Plaintiff Midstate Equipment, Inc. (hereinafter "Midstate"), is an Alaska corporation. It is a civil construction contractor located in Delta Junction, Alaska.

2. Defendant Ahtna Construction and Primary Products, LLC (hereinafter "Ahtna"), is an Alaska limited liability company. It is a general contractor specializing in civil construction.

3. Defendant Great American Insurance Company (hereinafter "Great American") is an Ohio corporation authorized to do business in Alaska as a surety.

4. Ahtna entered into an agreement with the United States Department of Agriculture, Natural Resources Conservation Service (hereinafter "NRCS"), in 2018 to perform work at the Delta Clearwater Remediation Project Phase 2 near Delta Junction, Alaska (hereinafter "the Project"). The NRCS/Ahtna contract is referred to hereinafter as the "Prime Contract."

5. As required by law, Ahtna provided a payment bond ("the Bond") for the Project. The Bond was issued by Great American.

6. Among other things, the Prime Contract required Ahtna to provide and spread topsoil and woody debris on the Project site in accordance with the specifications in the Prime Contract. Ahtna agreed that it would be paid on a unit price basis of a fixed amount per square yard.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                              Page 2

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 2 of 54

7.     Prior to submitting its bid for the Project, Ahtna had received a proposal from Midstate (hereinafter "Quote") to supply and deliver top soil and woody debris to the Project.  The Quote was given to Ahtna on January 4, 2018.  In the Quote, Midstate offered to deliver up to 424,450 square yards of topsoil and up to 517,829 square yards of woody debris.  No other supplier proposed to provide and deliver topsoil and woody debris.  Ahtna used Midstate's Quote in preparing its bid to construct the Project.

8.     Midstate proposed to provide and deliver topsoil at a price of $2.62 per square yard.  The Quote stated:  "Measurement for payment will be by an agreed price per cuyd per truck load."

9.     Midstate proposed to provide and deliver woody debris at a price of $2.60 per square yard.  The Quote states:  "Measurement for payment will be by the truck load."

10.    Ahtna issued purchase order PO-07020-001 to Midstate (hereinafter "Purchase Order") for supplying and delivering topsoil and woody debris among other things.  The Purchase Order was executed by both parties.  The Purchase Order included as an attachment a copy of Midstate's Quote and stated in bold italicized language, "**Midstate Original Quote Attached as Reference Only**."  For NRCS, the Quote would have been very significant because it showed Midstate would provide the quantities of topsoil and woody debris required by the Prime Contract.  The Purchase Order was a unit price agreement using square yards for units of delivery.  It

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                         Page 3

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 3 of 54

specified payment terms of "Net 30." Unit costs were specified as $2.62 per square yard for topsoil and $2.60 per square yard for woody debris.

11.    Prior to commencement of deliveries by Midstate, Ahtna and Midstate did not discuss, much less agree on, the dimensions of a truckload nor a unit price per truckload for either topsoil or woody debris.

12.    NRCS estimated that the Project would require 424,450 square yards ("SY") of topsoil and 517,829 square yards of woody debris.[1] NRCS prepared detailed Project specifications ("Specifications") describing the types of materials to be used and the methods employed for their placement.[2]

13.    The Specifications stated Ahtna would be paid for both topsoil and woody debris based on "in-place" measurements. Ahtna and NRCS would together use professional surveyors to measure the total surface covered by these materials, determining the amount of surface area through a "horizontal projection" of the surveyed "perimeter."[3]

14.    For topsoil measurements, the parties would then calculate total square yards of material according to the measured perimeter and the uniform thickness or "lift" of the topsoil spread by Ahtna.[4]

---

[1] Trial Exhibit (hereinafter "Ex.") 6, p. 6.
[2] Ex. 3.
[3] Ex. 3, pp. 7, 11.
[4] Trial Transcript (hereinafter "Tr."). Vol. 3, pp. 107–11 (T. Champine) (describing process of measuring placed materials).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                        Page 4

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 4 of 54

15.     The Project drawings instructed Ahtna to spread the "loose" topsoil into an eight-inch-thick lift throughout the Basin and adjoining areas.[5]  The Specifications instructed Ahtna to spread the topsoil using a "low ground pressure (LGP) type dozer . . . equipped with and operating by GPS machine control."[6]  GPS devices mounted on the blade of the dozer monitored the height of the blade from the subgrade.[7]  The GPS machine control would adjust the height of the blade to compensate for any changes in the subgrade.[8]  The result was a consistent "loose" lift thickness.

16.     Section 7(a)(6) of the Specifications provided:  "The measured thickness of the topsoil shall be from the approved subgrade to the top of the loose topsoil before track-walking."[9]  "Track-walking" refers to the compression of the topsoil lift by the tracks of the dozer immediately after the blade at the front of the dozer has cut the loose topsoil into a lift.[10]  The Specifications thus required that the dozer maintain a blade height of eight inches to create the loose lift for purposes of measurement for payment, but did not require any particular compaction density or depth after the blade had "cut" this lift and the tracks of the dozer immediately compacted the topsoil.

---

[5]  Ex. 2, pp. 7–10, 17–19.
[6]  Ex. A, p. 53.
[7]  Tr. Vol. 4, p. 134 (D. McKoon); Tr. Vol. 4, p. 99 (D. O'Donnell) ("That dozer blade does not go below that 8 inches.").
[8]  Tr. Vol. 3, pp. 108–09 (T. Champine).
[9]  Ex. A, p. 53.
[10]  Tr. Vol. 3, pp. 108-109 (T. Champine).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                    Page 5
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 5 of 54

17.     The Project Specifications also provided detailed requirements for "furnishing and spreading woody debris at locations shown on the drawings."[11] The woody debris needed to have "a minimum stem length of four (4) feet and a minimum diameter of four (4) inches at the largest end."[12] Ahtna needed to spread the woody debris in a way that would result in "ground coverage" of 20 to 40 percent.[13]

18.     Both Ahtna and NRCS would measure the woody debris for payment by determining the "horizontal projection" of the surveyed "perimeter."[14] However, unlike the "lift thickness" requirement for topsoil, the woody debris placed within the measured perimeter would only "count" for payment if it met the ground coverage density required, regardless of how thick it was placed.

19.     According to the Specifications:  "Percent Ground cover shall be measured by throwing a 100-foot tape over random linear transects of the woody debris matrix" and measuring lengths of woody debris exceeding one (1) inch in diameter which are attached to a larger piece of wood meeting the four (4) inch diameter requirement."[15]  Consequently, if the person taking these measurements identified woody debris but it did not meet these dimensions, that woody debris would not create the required density and would not count towards the density requirement.  If placed

---

[11] Ex. A, p. 78.
[12] *Id.*
[13] *Id.*
[14] Ex. A, pp. 80–81; Tr. Vol. 3, p. 129 (T. Champine) (Q.  "Was there anyone else out there besides Ahtna that was going out and taking measurements of those boundaries?" A.  "NRCS took measurements of those boundaries").
[15] Ex. A, p. 78.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                    Page 6
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 6 of 54

woody debris did not result in the required ground coverage, other woody debris, with correct dimensions, could be added to the uncounted woody debris in order to pass the density requirements and be counted for payment.[16]

20.     As part of preparation of its bid on the Project, Ahtna contacted Midstate Equipment, Inc. ("Midstate").[17]  Midstate is a civil construction contractor located in Delta Junction, Alaska.

21.     Midstate determined that it could submit bids to supply the topsoil and woody debris to the Project, but chose not to bid to place the materials.[18]

22.     On January 4, 2018, Midstate delivered the Quote to Ahtna offering to deliver up to 424,450 SY of topsoil and 517,829 SY of woody debris to the Project.[19]  The Quote stated a unit price of $2.62 per SY of topsoil and $2.60 per SY of woody debris.

23.     The Quote stated "[p]lacement is responsibility of others."[20]  It also noted that for topsoiling:  "Measurement for payment will be by an agreed price per cuyd per truck load."[21]  It noted that for woody debris:  "Measurement for payment will be by the truck load."[22]

---

[16] Tr. Vol. 4, p. 123 (D. McKoon) ("What happens when you go out there and measure it after it's placed is you got – you got to place a lot of wood out there to make that area meet spec").
[17] Tr. Vol. 3, pp. 137–38 (T. Champine).
[18] Tr. Vol. 1, p. 13 (D. Karr).
[19] Ex. 5.
[20] *Id.*
[21] Ex. 5, p. 2.
[22] *Id.*

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                            Page 7

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 7 of 54

24.     The Quote did not further define "truckload" by describing either the types of trucks Midstate planned to use or the anticipated carrying capacity of those trucks.  The Quote also did not identify a unit price per truckload or state when the parties would be expected to arrive at such a price.

25.     On February 1, 2018, Ahtna and NRCS signed an agreement awarding the Project to Ahtna.[23]  NRCS agreed to pay Ahtna $4.40 per SY for topsoil and $3.55 per SY for woody debris.[24]

26.     On February 12, 2018, Ahtna delivered the Purchase Order to Midstate offering to purchase topsoil and woody debris for the Project.[25]  The Purchase Order stated the same estimated quantities and unit costs in the Quote.

27.     The Purchase Order was a "unit price" agreement, with square yards for units of delivery.[26]  It did not describe payment by the truckload.  It stated in bold italics:  "***Midstate Original Quote Attached as Reference Only.***"[27]

28.     Ahtna and Midstate executed the Purchase Order without any changes to the text on February 14, 2018.[28]

---

[23] Ex. 6, p. 2.
[24] Ex. 6, p. 6.
[25] Ex. 7.
[26] Tr. Vol. 3, p. 29 (J. Braham).
[27] Ex. 7, p. 3.
[28] Ex. 9.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                            Page 8
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 8 of 54

29.     Prior to performance, the parties neither discussed nor agreed upon the dimension of a "truckload" nor a unit price per "truckload" for either topsoil or woody debris.[29]

30.     Midstate began delivering topsoil on June 22, 2018.[30] Midstate used both side-dump trucks and lower-capacity end-dump trucks.[31] The trucks would enter the work area and dump the topsoil. Midstate did not confirm the quantity of the loads of topsoil as they were delivered by Midstate onto the jobsite.[32] Ahtna personnel examined the dumped load, but only to make sure there were no excessive organic materials.[33]

31.     On June 26, 2018, representatives of Ahtna, NRCS, and Midstate met at the Project site to evaluate the level of compaction in the topsoil immediately created by the dozer when it track-walked the eight-inch "loose" lift the blade at the front of the dozer had cut into the topsoil delivered by Midstate.[34] Ahtna and NRCS informally agreed that the tracks of the dozer compressed the loose lift to approximately 6.5 inches.[35]

32.     However, Ahtna and NRCS did not agree to change the eight-inch loose lift requirement in the Specification that was used to measure the lift and serve

---

[29] Ex. 20; Ex. 25.
[30] Tr. Vol. 1, p. 27 (D. Karr).
[31] Tr. Vol. 3, p. 14 (J. Braham).
[32] Tr. Vol. 2, p. 160 (S. Perkins); Tr. Vol. 2, p. 167 (C. Sonnichsen); Tr. Vol. 2, pp. 174–75 (K. Sams).
[33] Tr. Vol. 4, p. 110 (D. McKoon).
[34] Ex. B; Tr. Vol. 4, p. 140 (D. McKoon).
[35] Tr. Vol. 4, p. 140 (D. McKoon).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                            Page 9
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 9 of 54

as basis for payment to Ahtna.[36]  According to the contract between Ahtna and NRCS, such a change would have required a *written* modification to the Specifications under the parties' contract and the Federal Acquisition Regulations.[37]  There is no written modification between Ahtna and NRCS of any kind among the exhibits that were admitted at trial.  Midstate representatives Dick Karr and John Braham acknowledged at trial that he never saw such a modification.[38]

33.    Mr. Karr became concerned that the estimated track-walking compaction density discussed at the June 26 meeting was incorrect.[39]  He mistakenly believed that the specification had changed and the parties had agreed to a 6.5-inch compacted lift for purposes of payment, and that, because the topsoil might compact much more than eight inches during track-walking, Ahtna was now placing the materials "too thick" in order to meet the measurement for payment.[40]

34.    Mr. Karr began asking Midstate representatives onsite to sign daily load sheets indicating the number of truckloads of topsoil delivered.[41]  He did this because the load sheets stated an estimated average topsoil capacity for each truck, and Mr. Karr was concerned that being paid on the basis of in-place values rather than

---

[36] Tr. Vol. 3, pp. 156–57 (T. Champine) ("It's not a real deviation because they were approving the eight-inch loose fill was being complied with"); Tr. Vol. 4, pp. 98–99 (D. O'Donnell) ("We were paid on 8 inches loose at the cut below the dozer blade"); Tr. Vol. 4, p. 140 (D. McKoon) ("I know that this stuff was yielded in at 8 inches.  That's the only way you can place this stuff, to know what you're putting in.  That was the agreement.").
[37] Ex. 6, p. 31 (incorporating FAR 52.243-4 "Changes").
[38] Tr. Vol. 2, p. 115 (D. Karr); Tr. Vol. 3, p. 17 (J. Braham).
[39] Tr. Vol. 1, p. 48 (D. Karr).
[40] Ex. 29.
[41] Ex. 20.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*    Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                              Page 10

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 10 of 54

by the truckload would result in underpayment to Ahtna and, consequently, underpayment to Midstate.[42]

35.     The load sheets specified that each truck carried 112.5 SY of topsoil per load, despite the absence of any agreement on estimated truckload quantities between the parties.[43]  When assuming an eight-inch lift, 112.5 SY of topsoil is 25 cubic yards ("CY").[44]

36.     Mr. Karr also was concerned that Ahtna would not spread delivered woody debris to a minimum density of 20 percent.[45]  If Ahtna placed the woody debris at a higher density, then it would be placing more material than necessary, resulting in potential underpayment to Ahtna and, consequently, Midstate.[46]  For this reason, Mr. Karr also wanted to be paid by an estimated quantity per truckload for woody debris.[47]

37.     Mr. Karr had prepared the original bid estimate for Midstate.[48]  In it, he used an estimated truckload capacity of 28 CY of topsoil.[49]  However, in a July 22, 2018 letter to Ahtna, he informed Ahtna that it would be billed on the basis of 25 CY per truck.[50]  At trial, Mr. Karr testified that he planned to use the lower estimate in

---

[42] Ex. 24.
[43] Ex. 20, p. 2.
[44] Ex. E.  A "square yard" is a measurement of area, but a "cubic yard" is a measure of volume. In order to estimate the number of square yards a truck will carry it is necessary to convert those square yards into cubic yards.
[45] Ex. 25.
[46] Ex. 37.
[47] Ex. 25.
[48] Tr. Vol. 1, p. 13 (D. Karr).
[49] Ex. 4, p. 2.
[50] Ex. E.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                          Page 11
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 11 of 54

order to receive an interim payment and "get a cash flow going," with Midstate delivering a later invoice showing more accurate quantities later in the future.[51]

38.     On July 30, 2018, Midstate sent Ahtna its first invoice (Invoice 1931), billing for 911 loads of topsoil at an estimated truckload volume of 121.5 SY (27 CY).[52]     The invoice billed Ahtna for 1,080 loads of woody debris, with an estimated truckload volume of 124.24 SY.

39.     Ahtna acknowledged internally that it needed to make a "progress payment" to Midstate in order to keep its subcontractor funded, but Ahtna also needed a basis for Midstate's estimated average volumes before it could process payment.[53]

40.     Ahtna asked Midstate for a basis for the estimated truckload volumes in Invoice 1931.[54]  Midstate replied:  "We arrived at the load capacity thru past experience and field verification."[55]

41.     Ahtna informed Midstate that it needed a "more scientific" explanation for the estimates.[56]  A dispute ensued between the parties regarding the estimated volumes of each truck, the best method for determining estimated volumes, and the results of tests performed in an effort to establish those volumes.

---

[51]  Tr. Vol. 2, p. 109 (D. Karr); *see also* Tr. Vol. 2, p. 5 (D. Karr).
[52]  Ex. 33.
[53]  Tr. Vol. 3, p. 147 (T. Champine) (Q.  "Why not just pay the full amount of the invoice here?"  A.  "Because I don't have any data to justify those volumes"); *see also* Ex. 36; Ex. 49.
[54]  Ex. 35.
[55]  *Id.*
[56]  Ex. 37.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                          Page 12
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 12 of 54

42. On August 3, 2018, Midstate sent Ahtna a revised Invoice 1931.[57] The load count remained the same, but Midstate increased its estimated truckload capacities to 129.5 SY per truck for topsoil and 124.24 SY per truckload for woody debris.

43. Ahtna began receiving estimates of placed quantities from its surveyors, who were using the methods described in the Specifications to measure the amount of placed topsoil and woody debris.[58] Ahtna noted that Midstate's invoice requested 21.4 percent more topsoil than measured in-place, and 25.67 percent more woody debris than measured in-place.

44. To Ahtna, the variance between invoiced quantities and measured quantities indicated that Midstate was sending topsoil in underloaded trucks and woody debris that did not meet the required Specification (*i.e.*, woody debris that was placed but did not "count" toward payment).[59]

45. Ahtna's Project Superintendent had observed underloaded trucks of topsoil at the Project "all summer long," confirming Ahtna's theory explaining the variance.[60] Ahtna had not rejected these truckloads because the topsoil was needed to move the Project forward and meet the Project deadlines, and it made no sense to reject

---

[57] Ex. 45.
[58] Ex. 46; Tr. Vol. 3, pp. 125–29 (T. Champine).
[59] Ex. 46; Tr. Vol. 3, p. 172 (T. Champine).
[60] Tr. Vol. 4, pp. 112–14 (D. McKoon).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*  Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                 Page 13
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 13 of 54

usable topsoil when Midstate was at all times being paid by the in-place square-yard and not the truckload.[61]

      46.    Although Midstate disputed that the trucks of topsoil were underloaded, Ahtna was not routinely inspecting truckloads and thus had no verification beyond individual reports from the jobsite. Because Midstate was being paid for in-place square-yards, there was no system in place (by either Midstate or Ahtna) to inspect the truckloads of topsoil prior to delivery and make sure that they were full.[62]

      47.    At trial, Midstate presented testimony during a review of 14 photos of side-dump trucks, stating that each truck was carrying more than 27 CY of topsoil.[63] However, 14 photos is too small a sample from which to draw the conclusion that Midstate consistently delivered more than 2,500 full loads throughout the Project.

      48.    Ahtna put Midstate on notice that it was observing underloaded trucks of topsoil. Ahtna's Project Manager had called Midstate's president, John Braham, earlier in the Project, and asserted that Ahtna personnel were complaining of underloaded trucks.[64]

      49.    On the woody debris, Ahtna's Project Superintendent also observed delivered loads with less than four inches diameter at the stem and therefore

---

[61] Tr. Vol. 4, pp. 115–16 (D. McKoon) ("I take all the topsoil that I could get, right?").
[62] Tr. Vol. 4, pp. 114–16 (D. McKoon).
[63] Tr. Vol. 3, pp. 7–12; Ex. 64, 65, 66, 68, 69, 70, 74, 75, 76, 77, 78, 81, 86.
[64] Tr. Vol. 2, pp. 183–84 (J. Braham).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*    Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law    Page 14
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 14 of 54

at a density lower than required in the Project Specifications.[65] Ahtna generally did not reject these truckloads because the materials could be placed at the Project together with the in-spec woody debris, saving the time and effort of either sorting the pile or finding a way to return the entire pile of woody debris to the harvest area.[66] Also, Midstate acknowledged at trial that it did not have the capability to haul-away out-of-spec debris rejected by Ahtna.[67]

50.     Out-of-spec woody debris placed at the Project would not "count" towards payment because it would not be captured in the measurements made by Ahtna and NRCS.[68] Ahtna believed that Midstate would ultimately receive payment only for the in-spec material that it delivered because Midstate was at all times paid by the in-place square-yard and not the truckload.

51.     Midstate's project manager accused Ahtna personnel of lying about light loads of topsoil delivered to the Project.[69]

52.     Midstate requested a meeting between its president, John Braham, and Ahtna's President, Dave O'Donnell, to resolve the dispute over estimated and actual quantities of delivered materials.[70]

---

[65] Tr. Vol. 4, pp. 123–27 (D. McKoon).
[66] Tr. Vol. 4, pp. 118–19 (D. McKoon).
[67] Tr. Vol. 2, p. 126 (D. Karr).
[68] Tr. Vol. 4, p. 123 (D. McKoon) ("What happens when you go out there and measure it after it's placed is you got – you got to place a lot of wood out there to make that area meet spec").
[69] Ex. 50; Tr. Vol. 2, p. 128 (D. Karr).
[70] Ex. 51.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law     Page 15
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 15 of 54

53. The two individuals met at the jobsite on August 13, 2018.[71] Mr. Karr indicated to Mr. O'Donnell at this meeting that he was trying to avoid financial hardship and looking for a payment of some kind in order to further fund his work.[72] Mr. Karr acknowledged that Midstate had botched its original bid.[73] The parties did not come to an agreement at the meeting regarding quantities.

54. Mr. Karr sent an email to Mr. O'Donnell on August 22, 2018, asking for an agreement that the estimated average truckload capacity for Midstate's trucks was 27 CY (121.5 SY) for topsoil and 120 SY for woody debris.[74]

55. On August 22, Mr. O'Donnell wrote back: "Even though you gave me a number in your bid which follows the bid schedule as well as the specifications in which to measure against, I'll agree to the truck load measurement of 120 sq./yd for woody debris and 27 CY on topsoil. With that being said, I also reserve my right to reject any load that does not meet those volumes or does not meet project specifications. This is final and I will not entertain any other discussion on this matter."[75]

56. Mr. O'Donnell explained at trial that by "I'll agree to the truckload measurement" he meant that Ahtna would agree to process interim payment on the basis of the estimated measurements.[76] Midstate offered no evidence

---

[71] Ex. 51; Tr. Vol. 4, pp. 57–64 (D. O'Donnell).
[72] Tr. Vol. 4, pp. 60–62 (D. O'Donnell).
[73] Tr. Vol. 4, p. 62 (D. O'Donnell).
[74] Ex. 53.
[75] Ex. 54.
[76] Tr. Vol. 4, p. 65 (D. O'Donnell).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                            Page 16
Case 4:19-cv-00010-JWS    Document 184    Filed 08/17/21    Page 16 of 54

demonstrating that this was not Mr. O'Donnell's intention at the time he made the statement.

57.     Mr. O'Donnell also explained at trial that by "this is final" he meant that there would be no further discussion as to the estimated average capacities of the trucks for purposes of processing interim payment to Midstate.[77]  In other words, "final" did not refer to future payments on the basis of truckload measurements being final payments rather than interim payments.    Midstate offered no evidence demonstrating that this was not Mr. O'Donnell's intention at the time he made the statement.

58.     At trial, Ahtna presented expert testimony that the practice of interim or "progress" payments following delivery of civil construction materials is standard practice for similar projects in Alaska.[78]  The purpose of progress payments and a final reconciliation is to address the uncertainty as to delivered quantities without in-place measurements and at the same time the need for the subcontractor/supplier to receive some form of payment in order to continue funding their operations.[79]

59.     Mr. O'Donnell testified that he did not explicitly inform Mr. Karr of the fact that invoices would be paid only as interim progress payments because Mr. O'Donnell knew Mr. Karr personally and reasoned that a person with so much

---

[77] Tr. Vol. 4, p. 66 (D. O'Donnell).
[78] Tr. Vol. 4, p. 33 (M. Jens).
[79] *Id.*

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                    Page 17
Case 4:19-cv-00010-JWS    Document 184    Filed 08/17/21    Page 17 of 54

experience in Alaska civil construction would anticipate receipt of progress payments.[80]

60.     Mr. Champine, who reviewed invoices from Midstate throughout 2018, also did not inform Midstate that it would receive interim progress payments. Mr. Champine also reasoned that the industry practice was so pervasive in Alaska civil construction that it was unnecessary to inform Midstate.[81]

61.     John Braham, president of Midstate, was personally expecting that Midstate was receiving interim progress payments at least at some point during performance of the work.  He testified at trial that Midstate intended to later send a final invoice on the basis of actual placed quantities but never did so.[82]

62.     Prior to the August 22 agreement, Ahtna had observed that Midstate's truckloads were "trending up" and become more and more full.[83]  But after August 22 these truckloads began to lighten.[84]

63.     On August 25, 2018, Midstate informed Ahtna that it was now delivering "marginal" woody debris with a diameter of approximately 3.5 inches.[85] Midstate was running-out of debris that was four inches and above in diameter, so it "took a chance" and delivered the marginal trees in hopes that the materials would

---

[80] Tr. Vol. 4, pp. 75–82 (D. O'Donnell).
[81] Tr. Vol. 3, pp. 166–67 (T. Champine).
[82] Tr. Vol. 3, pp. 13–14 (J. Braham).
[83] Tr. Vol. 4, pp. 62–63 (D. O'Donnell).
[84] Tr. Vol. 4, pp. 70–71 (D. O'Donnell).
[85] Ex. 55.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                    Page 18
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 18 of 54

ultimately meet the Project Specifications.[86] This woody debris could be placed by Ahtna but would not be counted for purposes of payment when the woody debris was measured.[87]

64. On August 29, 2018, Midstate delivered Invoice 1940, requesting payment for 632 truckloads of topsoil and 1,148 truckloads of woody debris according to the estimated capacities stipulated in the August 22 email.[88]

65. Invoice 1940 erroneously included in the stated count of truckloads of topsoil some deliveries by an end-dump vehicle Midstate used, which carried less than 27 CY.[89] There was no evidence at trial of an agreement between the parties as to the estimated average quantities of the end-dump vehicles.

66. On September 24, 2018, Midstate submitted Invoice 1951, requesting payment for 444 truckloads of topsoil and 552 truckloads of woody debris according to the estimated capacities stipulated in the August 22 email.[90]

67. On October 3, 2018, Midstate submitted Invoice 1953, requesting payment for 310 truckloads of topsoil and 370 truckloads of woody debris according to the estimated capacities stipulated in the August 22 email.[91]

---

[86] Ex. 55.
[87] Tr. Vol. 4, p. 123 (D. McKoon).
[88] Ex. 56.
[89] Ex. R, p. 9.
[90] Ex. 84.
[91] Ex. 89.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*  Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law  Page 19
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 19 of 54

68.     On October 8, 2018, Midstate submitted Invoice 1954, requesting payment for 22,356 SY of topsoil and 39,960 SY of woody debris.[92]  This invoice did not include a count of truckloads.

69.     In October the 2018 season ended and the Project shut down for the winter.

70.     During the shutdown, Ahtna consulted with its surveyor to determine the amount of topsoil and woody debris placed at the Project using the system of measurement described in the Specifications.[93]  Ahtna did this in order to prepare a pay application to NRCS summarizing all materials placed in 2018.

71.     Using survey data, Ahtna calculated that it had placed 248,679 SY of topsoil and 336,199 SY of woody debris in 2018.[94]  Following a lengthy approval process, NRCS paid Ahtna for these quantities according to the original unit price agreement.[95]

72.     By the end of 2018, Midstate had billed Ahtna for 301,418 SY of topsoil and 417,960 SY of woody debris.[96]  That was a substantial variance between what Midstate invoiced Ahtna for and what NRCS had approved for payment to Ahtna.[97]

---

[92] Ex. 93.
[93] Tr. Vol. 3, p. 142 (T. Champine).
[94] Ex. G, p. 29.
[95] Tr. Vol. 3, pp. 140–42 (T. Champine); Tr. Vol. 4, pp. 75–76 (D. O'Donnell).
[96] Ex. 102, pp. 1–3.
[97] Ex. 102.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*      Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                              Page 20
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 20 of 54

73.     On November 2, 2018, Ahtna sent Midstate a letter informing them of the variance between the quantity billed and the quantity placed.[98]  Ahtna concluded that Midstate's estimate of square yards on the basis of truckload capacities had been highly inaccurate.

74.     Ahtna further concluded that this inaccuracy was due to either: (1) a failure of the parties to properly estimate the average capacity of each vehicle; (2) the delivery of underloaded trucks of topsoil and woody debris that was out-of-specification and therefore not counted toward payment; or (3) all of the above.[99]

75.     Ahtna explained at trial that it waited until November 2, 2018, to send a letter explaining actual placed quantities and corresponding payment to Midstate because it was only at that point that Ahtna had completed its survey of placed quantities, received certified approval from NRCS, and prepared a pay application for reimbursement to Ahtna.[100]

76.     Midstate presented no evidence at trial that Ahtna intentionally waited until November 2, 2018, to send the above letter to Midstate in order to wait until Midstate was done delivering materials for the 2018 season.

_____

[98] *Id.*
[99] *Id.*
[100] Tr. Vol. 4, pp. 75–76 (D. O'Donnell).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                    Page 21

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 21 of 54

77.     Ahtna agreed to make a final payment of $108,251.18 to "true-up" for all materials delivered and measured in-place.[101]   Ahtna made the payment on December 28, 2018.[102]

78.     Midstate believed that it had been underpaid.   On December 21, 2018, Midstate placed a Miller Act claim on Ahtna's payment bond, in the amount of $376,564.82.[103]

79.     On March 15, 2019, Midstate requested information regarding its continued performance in 2019.[104]

80.     On March 29, 2019, Ahtna informed Midstate that it was cancelling further deliveries from Midstate.[105]   Ahtna asserted that the delivery of incomplete loads of topsoil and non-conforming loads of woody debris had resulted in invoicing for materials never delivered, and Ahtna was therefore cancelling further deliveries.[106]

81.     Ahtna procured topsoil and woody debris for the Project in 2019 by self-performance.[107]   Ahtna avers that it enjoyed a savings in comparison to the amounts charged by Midstate because Ahtna consistently procured complete loads of topsoil and woody debris that always met the specified dimensions.[108]

---

[101]  Ex. 102, p. 5.
[102]  Ex. 106, p. 5.
[103]  Ex. 105, p. 24; *see* 41 U.S.C. § 3131 *et seq.*
[104]  Ex. 111.
[105]  Ex. 114.
[106]  Ex. 114, p. 6.
[107]  Tr. Vol. 4, p. 73 (D. O'Donnell).
[108]  Ex. 122; Tr. Vol. 4, pp. 22–23 (T. Champine).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                        Page 22
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 22 of 54

82. Total invoices from Midstate and payments by Ahtna in 2018 are as follows:

| Invoice No | Invoice Date | Amount | Date Paid | Amount Paid | Balance |
|---|---|---|---|---|---|
| 1931 (v.3)[109] | 7/27/2018 | $ 626,958.63 | 09/25/2018 | $ 626,958.63[110] | $ - |
| 1940 (v.2)[111] | 8/31/2018 | $ 559,325.19 | 10/12/2018 | $ 559,325.19[112] | $ - |
| 1951[113] | 9/24/2018 | $ 313,562.52 | 10/19/2018 | $ 313,562.52[114] | $ - |
| 1953[115] | 10/3/2018 | $ 214,122.30 | 12/28/2018 | $ 108,251.18[116] | $ 105,871.12 |
| 1954[117] | 10/8/2018 | $ 162,468.72 | 11/9/2018 | $ 42,000.00[118] | $ 120,468.72 |
| | | $ 1,876,437.36 | | $1,608,097.52 | $ 253,079.56 |

83. Midstate struggled to demonstrate the actual amount outstanding and the accuracy of its own invoices. For example, Midstate has acknowledged that Invoice 1931 (v.3) overbilled Ahtna by $7,332.75 because Midstate incorrectly invoiced for topsoil that was actually woody debris, and incorrectly invoiced for topsoil at 27 CY per truckload when Midstate had used an end-dump truck carrying just 12 CY per truckload.[119] Midstate made similar mistakes in Invoice 1940, overbilling Ahtna $7,250.83.[120]

84. At trial Mr. Karr could not explain why Invoice 1931 billed Ahtna for 1,080 loads of woody debris and yet his analysis of truck tickets showed only 1,051

---

[109] Ex. 61.
[110] Ex. 106, p. 2.
[111] Ex. 63.
[112] Ex. 106, p. 3.
[113] Ex. 84.
[114] Ex. 106, p. 3.
[115] Ex. 89.
[116] Ex. 106, p. 5.
[117] Ex. 93.
[118] Ex. 106, p. 4.
[119] Ex. 170.
[120] Ex. 170, p. 2.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*      Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                    Page 23
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 23 of 54

loads.[121]  Mr. Braham admitted that Midstate had billed Ahtna for materials it never delivered.[122]

85.     Midstate's expert economist attempted to change his damages calculus in the middle of trial to correct the overbilling.[123]  However, he also acknowledged that the records generally used to formulate Misdate's invoices "do not agree with each other."[124]

86.     Midstate continued invoicing Ahtna even after the parties' contract had terminated.  On February 5, 2020, Midstate informed Ahtna that in the course of litigation it had "discovered" truck tickets for 84 loads of topsoil that were never invoiced.[125]  Despite the cancellation of the parties' contract one year prior, Midstate demanded payment within 30 days.

87.     Rather than wait 30 days for payment, Midstate asked this Court two days later for leave to amend its Complaint and include the balance for the "discovered" truck tickets in its damages quantum.[126]  Midstate was now suing Ahtna for a balance not yet due.

---

[121] Tr. Vol. 2, pp. 131-135.
[122] Tr. Vol. 3, p. 27 (J. Braham) (Q.  "So Ahtna paid for woody debris that it never got, right?" A.  "Yes").
[123] Ex. 171; Tr. Vol. 3, p. 75 (G. Moorehead).
[124] Tr. Vol. 3, p. 82.
[125] Ex. 138.
[126] *See* Motion for Relief from Deadline to File Amended Complaint, Docket 31.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                          Page 24
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 24 of 54

### III.   CONCLUSIONS OF LAW

#### Breach of Contract

1.      The parties do not dispute the validity of the Purchase Order or the enforceability of the stipulated agreement regarding estimated truckload quantities, memorialized in the August 22, 2018 email from Mr. O'Donnell to Mr. Karr (hereafter the "August 22 Email").

2.      A breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract.[127]  Midstate asserts that Ahtna breached the parties' contract twice:  first when it failed to pay Midstate's invoices and again when it canceled further deliveries.

3.      Because the parties' agreement was an agreement for the purchase of goods, the Uniform Commercial Code ("UCC"), as incorporated in Alaska Statutes, governs the construction and enforcement of the agreement.[128]

4.      The parties present competing interpretations of both the original Purchase Order and the agreement memorialized in the August 22 Email.  This Court interprets both agreements by "ascertain[ing] and giv[ing] effect to the reasonable intentions of the contracting parties."[129]

---

[127]  *Kimp v. Fire Lake Plaza II, LLC*, 484 P.3d 80, 89–90 (Alaska 2021) (quoting 23 WILLISTON ON CONTRACTS § 63:1 (4th ed. 2018)).
[128]  *See* AS 45.02.101 *et seq.*
[129]  *W. Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 656 (Alaska 1991); *see also Weiner v. Burr, Pease & Kurtz, P.C.*, 221 P.3d 1 (Alaska 2009) (applying rule of construction to a disputed modification to an existing agreement).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*      Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                    Page 25
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 25 of 54

5. The court may attempt to ascertain the intent of the contracting parties by examining "language of the contract as a whole, the objects sought to be accomplished by the contract, the circumstances surrounding its adoption, and case law interpreting its provisions."[130] The relevant extrinsic evidence examined by the court is the course of performance by the parties, the course of dealing between the parties, and the usage of trade.[131]

6. The parties do not dispute that the Purchase Order was a unit price agreement to deliver quantities of topsoil and woody debris at a square yard unit price. The parties do dispute whether the Purchase Order obligated them to later agree to a stipulated quantity of each material carried by each truck for purposes of payment.

7. However, it is not necessary for the Court to decide this issue. Ahtna did later agree to pay by the truckload on the basis of a stipulated quantity. The August 22 Email offered, and Midstate accepted, a modification to the Purchase Order that stipulated "the truckload measurement of 120 sq./yd. for woody debris and 27 cy on topsoil."[132] Five times in 2018 Midstate invoiced for square yards of delivered materials by multiplying its recorded truckloads by these stipulated truckload measurements, and Ahtna paid three of these invoices in full.

8. The court must decide whether the August 22 Email was an offer to make "interim" payments on the basis of stipulated truckload measurements, with

---

[130] *Monzigo v. Alaska Air Grp., Inc.*, 112 P.3d 655, 660 (Alaska 2005).
[131] AS 45.02.202.
[132] Ex. 54.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*      Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                               Page 26

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 26 of 54

final payment delivered to Midstate on the basis of the actual measured quantity of square yards of material delivered by Midstate.

9.    The plain language of the August 22 Email does not lend itself to either party's interpretation. On the one hand, there is no mention of "interim" or "progress" payments, so the plain meaning does not clearly warrant that interpretation. On the other hand, the August 22 Email only agrees to a stipulated "truck load measurement," and does not state whether such measurement is a unit price basis for payment that replaces the original "square yard" basis for payment stated in the Purchase Order.

10.    The August 22 Email states: "This is final and I will not entertain any other discussion on the matter."[133] Mr. O'Donnell explained at trial that "this is final" did not mean that all further payments to Midstate would be final, but rather that there would be no further discussion as to estimated truckload measurements.[134] A plain reading of the August 22 Email, which makes no reference whatsoever to payments, supports Mr. O'Donnell's testimony.

11.    Even if the plain language of the August 22 Email were sufficient to show the intent of the contracting parties, "[i]t is not necessary to find that an agreement is ambiguous before looking to extrinsic evidence as an aid to determine

---

[133] *Id.*
[134] Tr. Vol. 4, p. 66 (D. O'Donnell).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*    Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                          Page 27

Case 4:19-cv-00010-JWS    Document 184    Filed 08/17/21    Page 27 of 54

what it means."[135]   The Court finds that extrinsic evidence is of assistance to determining the intent of the contracting parties.

12.     The course of performance of the parties provides almost no evidence in support of either party's interpretation of the agreement.   Neither side produced evidence at trial showing that either party had indicated to the other in the course of performance whether or not payments processed by Ahtna after August 22, 2018, were "interim" only.

13.     However, there was evidence at trial that in the course of performance Midstate delivered truckloads of topsoil that were not fully loaded and truckloads of woody debris that did not meet specifications.  Midstate's performance provides some circumstantial evidence that it was expecting payment by the truckload only and not on the basis of in-place materials, because a reasonable contractor expecting to be paid on the basis of in-place materials would use care to deliver fully loaded trucks with materials that conformed to the specifications.

14.     Turning to the course of dealings between the parties, there is evidence in support of Ahtna's interpretation.  Mr. Karr acknowledged at trial that he was planning on receiving an interim payment in order to "get some money in the bank."[136]

---

[135] *Estate of Polushkin ex rel. Polushkin v. Maw*, 170 P.3d 162, 167 (Alaska 2007); *see also* AS 45.02.202.
[136] Tr. Vol. 2, p. 109 (D. Karr); Tr. Vol. 2, p. 5 (D. Karr); *see also* Ex. R, p. 9 ("Midstate sent this invoice with conservative quantities, so it could take an approved invoice to the bank to be used as borrowing collateral.").

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*          Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                                    Page 28
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 28 of 54

15.    Also, Midstate's president, John Braham, delivered a letter to Ahtna on July 22, 2018, stating several times that Midstate's invoices were "pay estimates" rather than describing them as final.[137]  At trial, Mr. Braham agreed the invoices sent by Midstate were a request for interim payment, with another invoice to follow later based on "what was actually hauled by the trucks."[138]

16.    Turning to evidence of the usage of trade there is stronger evidence in support of Ahtna's interpretation.  Ahtna's President testified that interim payments followed by a final payment on the basis of actual quantities delivered is industry practice in agreements for the delivery of unit price materials to a civil construction project.[139]  Ahtna's expert witness, Mike Jens, testified that on the basis of more than 50 years working in civil construction projects it was his observation that the "interim payments" approach is standard industry practice.[140]  Midstate provided no testimony to the contrary at trial.

17.    On balance, the extrinsic evidence supports Ahtna's interpretation of the August 22 Email, which is that Ahtna offered, and Midstate accepted, interim payments on the basis of estimated truckload quantities and a reconciliation of these interim payments with the actual quantities of materials measured-in place once Ahtna made these measurements.

---

[137] Ex. E.
[138] Tr. Vol. 3, p. 14 (J. Braham).
[139] Tr. Vol. 4, pp. 66–69 (D. O'Donnell).
[140] Tr. Vol. 4, p. 33 (M. Jens).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*    Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law    Page 29
Case 4:19-cv-00010-JWS    Document 184    Filed 08/17/21    Page 29 of 54

18.     The next issue is whether Midstate was given a final payment on the basis of in-place quantities, pursuant to the parties' agreement. Ahtna made a final payment of $108,251.18 to Midstate for quantities delivered.[141]

19.     The UCC obligates Ahtna to "pay at the contract rate for any goods accepted."[142] As explained above, the "contract rate" was at all times $2.62 per SY for topsoil and $2.60 per SY for woody debris.

20.     NRCS paid Ahtna for 248,679 SY of topsoil and 336,199 SY of woody debris.[143] Ahtna paid Midstate for 248,679 SY of topsoil and 336,215 SY of woody debris.[144] Ahtna fully compensated Midstate for calculated in-place quantities, with overpayment to Midstate for 16 SY of woody debris.

21.     Midstate argues in the alternative that, even if Midstate was to be paid according to "in-place" measurements, Ahtna reimbursed it for an insufficient number of square yards. Under Alaska law, Midstate is entitled to payment only for goods actually delivered and accepted.[145]

22.     Turning first to topsoil, Midstate argues that Ahtna placed the topsoil too thick on the Project grade, resulting in underpayment to Ahtna and consequently Midstate after surveyors calculated the total square yardage.

---

[141] Ex. 102.
[142] AS 45.02.607(a).
[143] Ex. G, p. 29.
[144] Ex. 102.
[145] AS 45.02.507(a); AS 45.02.601.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                          Page 30
Case 4:19-cv-00010-JWS     Document 184     Filed 08/17/21     Page 30 of 54

23.     Midstate asserts that the Specifications originally assumed an eight-inch loose lift cut by the dozer immediately prior to track-walking, but Ahtna and NRCS changed the assumption to a 6.5-inch compacted lift after track-walking. Midstate asserts that the change did not correctly account for actual topsoil compaction, and the result was Ahtna placing the topsoil too thick, thereby skewing the final measurement for payment to less than the actual placed square yards.

24.     There is no evidence of a change in the Specifications, which would need to be in writing in order to be legally binding.  Ahtna established at trial that it was paid on the basis of an eight-inch loose lift thickness at all times, notwithstanding an informal agreement as to the effect of track-walking on the loose topsoil.

25.     Ahtna demonstrated, through both expert testimony and the testimony of onsite personnel, that Ahtna maintained a consistent eight-inch loose lift thickness by maintaining a blade on its dozer that compensated for changes in the subgrade via GPS technology.[146]

26.     Midstate's evidence to the contrary did not include expert opinion of any kind.  It primarily consisted of daily reports prepared by Mr. Karr to Ahtna, stating that he observed varying topsoil thickness of seven to nine inches during the work.[147]  Mr. Karr was under the mistaken impression Ahtna and NRCS had agreed to

---

[146] Tr. Vol. 4, p. 36 (M. Jens) ("No, I didn't see that they had put it in too thick").
[147] Ex. 91, pp. 81–87.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                         Page 31
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 31 of 54

measurement for payment on the basis of a compacted lift, so these anecdotal findings do not go to the actual issue, which is whether the blade of the dozer maintained a consistent loose lift thickness. Midstate offered no evidence at trial regarding the operation of the dozer.

27. Midstate has not proven that Ahtna placed topsoil in a way that resulted in inaccurate in-place measurements at the conclusion of the 2018 season.

28. Midstate also has not proved that the methods used by Ahtna to measure in-place topsoil—prescribed by NRCS and not at Ahtna's discretion—were inaccurate.

29. Turning next to woody debris, Midstate alleges that the measurements were inaccurate because Ahtna had placed these materials too thick, resulting in underpayment for actual quantities used.

30. Midstate's evidence consisted primarily of some photographs taken by Mr. Karr after Ahtna had cancelled further deliveries by Midstate, allegedly showing materials placed too thick.[148] Midstate presented no actual measurements of placed materials at trial. It also did not challenge the efficacy of the measurement-for-payment method described in the Specifications. It also did not rebut expert testimony from Ahtna's expert regarding Ahtna's placement methods and the accuracy of its measurements.[149]

---

[148] Tr. Vol. 2, pp. 48–61 (D. Karr).
[149] Tr. Vol. 4, p. 38 (M. Jens).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                          Page 32

Case 4:19-cv-00010-JWS     Document 184     Filed 08/17/21     Page 32 of 54

31.     Ahtna did acknowledge at trial placing woody debris very thick at times.  It did so because Midstate had delivered "marginal" trees that may or may not meet the requirement of four inches in diameter.  At the time of the Project, Midstate did not dispute it was delivering "marginal" woody debris.[150]

32.     Ahtna attempted to use the marginal woody debris, placing the materials at whatever thickness appeared to be necessary in order to meet the requirements of the Specifications.  According to Ahtna, any deficiency in the woody debris that resulted in placement of a large quantity of materials was Midstate's fault.  Ahtna's explanation is persuasive.

33.     Midstate has not proven that Ahtna placed woody debris in a way that resulted in inaccurate in-place measurements at the conclusion of the 2018 season.

34.     Midstate also has not proved that the methods used by Ahtna to measure in-place woody debris—prescribed by NRCS and not at Ahtna's discretion—were inaccurate.

35.     Ahtna's theory as to the reason for Midstate invoicing in excess of placed materials is that Midstate delivered underloaded trucks of topsoil and out-of-specification woody debris.  This theory is persuasive.  It is supported by the evidence of light and nonconforming loads, summarized in the above findings of fact.

[150]  Ex. K.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                      Page 33
Case 4:19-cv-00010-JWS     Document 184     Filed 08/17/21     Page 33 of 54

36.     Midstate has not demonstrated that the quantities used by Ahtna to pay Midstate were inaccurate.  Ahtna did not breach the parties' contract when it delivered final payment for measured square yards.

37.     Midstate argues in the alternative that Ahtna was contractually obligated to pay for the truckloads it delivered, regardless of the actual quantity of conforming materials later measured in-place, because Ahtna accepted those truckloads, and rejected almost no loads over the course of the Project.

38.     A buyer's obligation to pay for goods is triggered by acceptance of the goods.[151]

39.     As a buyer of goods, Ahtna had the right to inspect the topsoil and woody debris "before payment or acceptance" and "at a reasonable place and time and in a reasonable manner" following tender of materials by Midstate.[152]  Tender of delivery took place when Midstate delivered the materials to the jobsite and Ahtna exercised control over the materials.  Ahtna inspected the topsoil and woody debris upon tender, and accepted almost all of the materials following inspection.

40.     However, the inspection of topsoil conducted by Ahtna at the jobsite did not encompass the *quantity* of topsoil delivered, only whether or not the topsoil contained excessive organic material.[153]  The requirement of the UCC that the

---

[151] AS 45.02.607(a).
[152] AS 45.02.513(a).
[153] Tr. Vol. 4, p. 110 (D. McKoon).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law     Page 34
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 34 of 54

quality of goods conform to the contract applies to the quantity of the goods delivered.[154]

41.     Ahtna demonstrated at trial that an inspection of the actual number of square yards delivered could not occur until Ahtna spread the topsoil onto the grade and measured the dimensions.  It was also unreasonable for Ahtna to send back what appeared to be an underloaded truck or small pile—Ahtna did not want to reject perfectly-good topsoil.[155]

42.     Midstate presented no evidence at trial that Ahtna could have or should have measured the square yards of topsoil delivered before spreading it in order to confirm the number of square yards delivered.

43.     Similarly, the inspection of woody debris immediately after delivery did not evaluate how much of the woody debris inside the pile contained "marginal" or out-of-spec materials—only that some trees in the pile were out-of-specification.[156]

44.     Ahtna did not measure the actual quantity of topsoil or in-spec woody debris delivered until after the materials were delivered, spread, and measured for payment by both Ahtna and NRCS, and Ahtna and NRCS conferred regarding an agreement on the quantities and concomitant payment to Ahtna.  Ahtna's President

---

[154] *See*, e.g., *Pomerantz Paper Corp. v. New Cmty. Corp.*, 25 A.3d 221 (N.J. 2011).
[155] Tr. Vol. 4, pp. 115–16 (D. McKoon).
[156] Tr. Vol. 4, pp. 118–19 (D. McKoon).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*          Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                Page 35
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 35 of 54

explained at trial that final certification of placed materials by NRCS could take months after performance of the work.[157]

45.    It would be reasonable to expect that Midstate, which had reviewed the Specifications and itself previously delivered topsoil and woody debris for NRCS, would realize the difficulty of measuring actual quantities for payment upon initial acceptance of a truckload.[158]

46.    A buyer's obligation to pay for goods is triggered by acceptance of the goods.  However, a buyer may revoke acceptance prior to making payment if a "lot or commercial unit" does not conform to the requirements of the agreement to such extent that it "substantially impairs its value to the buyer," provided that the conformity has not been "seasonably cured" by the seller or the buyer's initial acceptance of the goods was "reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances."[159]

47.    Where a defect substantially impairs the value to the buyer, but that defect cannot be determined upon initial acceptance of the goods, a subsequent discovery of the defect and revocation of acceptance is timely.[160]

---

[157]  Tr. Vol. 4, p. 74 (D. O'Donnell).
[158]  Tr. Vol. 1, p. 3 (D. Karr).
[159]  AS 45.02.608; *see also Sumner v. Fel-Air, Inc.*, 680 P.2d 1109, 1116 (Alaska 1984) (failure to deliver title to airplane substantially impaired goods delivered, justifying revocation of acceptance).
[160]  *See S&R Metals, Inc. v. C. Itoh & Co. (Am.), Inc.*, 859 F.2d 814, 817 (9th Cir. 1988) (defect in 14-gauge steel could only be discovered following delivery and initial acceptance, making revocation of acceptance after discovery permissible under the UCC); *Exim Brickell LLC v. PDVSA Servs., Inc.*, 516 Fed. Appx. 742, 754 (11th Cir. 2013) (revocation of acceptance of some lots of powdered milk was timely where buyer demonstrated the difficulty of identifying the defect at the time of the initial acceptance).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law     Page 36
Case 4:19-cv-00010-JWS     Document 184     Filed 08/17/21     Page 36 of 54

48.     The November 2, 2018 letter from Ahtna to Midstate revoked acceptance of some of the topsoil and woody debris placed by Ahtna on grounds that Midstate had overstated the amount of materials delivered.

49.     The revocation of acceptance was both reasonable and timely. Ahtna demonstrated at trial the difficulty of discovery of the actual quantities delivered by Midstate and accepted by NRCS at the time of the initial acceptance of deliveries.

50.     There was no evidence at trial that Midstate attempted to cure the defect in quantities identified in the November 2, 2018 letter.

51.     A remaining issue is whether the difference between the amount invoiced and the amount measured in-place was a nonconformity that "substantially impaired" the value of the accepted goods, permitting revocation of prior acceptance. The existence of "substantial impairment" (of either a single installment or the whole contract) depends on the facts and circumstances of the particular case.[161]

52.     The November 2, 2018 letter observed an overage of 121 percent for topsoil and 124.31 percent for woody debris.[162] That is a substantial overage, and sufficient to substantially impair the value (asserted by Midstate) of the accepted goods.

53.     Midstate has not demonstrated that that Ahtna untimely revoked acceptance of incorrect quantities of topsoil and woody debris.

---

[161] *See Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am.*, 965 F. Supp. 1003, 1013 (W.D. Mich. 1997), aff'd, 165 F.3d 27 (6th Cir. 1998); *see also GNP Commodities, Inc. v. Walsh Heffernan Co.,* 420 N.E.2d 659, 669 (Ill. App. Ct. 1981).
[162] Topsoil: 248,679/301,418 = 121.21 x 100; Woody Debris: 336,215/417,960 = 124.31 x 100.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                          Page 37
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 37 of 54

## Wrongful Termination

54.     Midstate argues that Ahtna wrongfully repudiated its agreement with Midstate by cancelling further deliveries of topsoil and woody debris before work resumed in the 2019 construction season.

55.     Whether or not a cancellation of delivery is a breach of contract under the UCC depends in part on the nature of the contract. An "installment contract" is a contract that "requires or authorizes the delivery of goods in separate lots to be separately accepted."[163]

56.     The parties' agreement was an installment contract because it contemplated delivery of topsoil and woody debris by the truckload.

57.     Ahtna was permitted to reject installments of material that did not conform to either the quantity or the quality agreed to by the parties, but only to the extent that the defect identified by Ahtna "substantially impairs the value of that installment."[164]

58.     Moreover, "[i]f nonconformity or default with respect to one or more installments substantially impairs the value of the whole contract, there is a breach of the whole."[165]

---

[163] AS 45.02.612(a).
[164] *See* AS 45.02.612(b).
[165] AS 45.06.612(c).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*      Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                          Page 38

Case 4:19-cv-00010-JWS    Document 184    Filed 08/17/21    Page 38 of 54

59.     Mr. O'Donnell testified at trial that the reason Ahtna canceled further deliveries was:  "We had materials being delivered or asked to be paid for that weren't delivered."[166]

60.     The evidence at trial affirmed the accuracy of Mr. O'Donnell's statement.  For example, both Mr. Karr and Mr. Braham admitted that Ahtna paid Invoice 1931 even though it billed Ahtna for truckloads of woody debris never delivered.  Midstate acknowledged other instances of billing for nonexistent truckloads.[167]

61.     Again, the test of "substantial impairment" is subjective, and it is important to distinguish between a mere miscommunication and conduct by a seller that causes a breakdown in the parties' relationship.[168]  This situation was the latter. For example, John Braham admitted that when Ted Champine called him to discuss the problem of light loads and invoicing for undelivered truckloads, Mr. Braham "slammed the phone down, hung up on him."[169]  Mr. O'Donnell explained that reports of this kind of incident informed Ahtna's decision to cancel further deliveries.[170]

62.     Ahtna also based its decision on the variance between what Midstate billed Ahtna and what Ahtna measured in-place.[171]  Ahtna observed an

---

[166] Tr. Vol. 4, p. 72.
[167] Tr. Vol. 3, pp. 14–15 (J. Braham).
[168] *See Midwest Mobile Diagnostic Imaging, L.L.C.*, 965 F. Supp. 1003 considering the cumulative effect of the breaching party's performance based upon all the circumstances).
[169] Tr. Vol. 2, p. 184.
[170] Tr. Vol. 4, pp. 72–73 (D. O'Donnell).
[171] Ex. 114.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                    Page 39

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 39 of 54

overage of 121 percent for topsoil and 124.31 percent for woody debris. The overage confirmed reports from Mr. McKoon that Ahtna was delivering light loads of topsoil and defective woody debris that NRCS did not count toward payment. An overage of that degree substantially impaired the value (asserted by Midstate) of the whole contract.

63.     There was no evidence at trial that Midstate attempted to cure the defect in quantities identified in the November 2, 2018 letter. Ahtna properly cancelled further deliveries by Midstate.

64.     Finally, Midstate has asserted that Ahtna did not timely respond to a March 15, 2019 letter requesting assurance that Midstate would continue to provide materials to the Project during the 2019 season.[172] Ahtna responded to the letter on March 29, 2019, explaining that it was canceling further deliveries by Midstate.[173]

65.     Whether Ahtna timely delivered notice of the cancelation "depends on the nature, purpose, and circumstances of the action."[174] The Court finds that a period of 14 days between the request for assurance and the notification of cancellation was not an unreasonably long period of time under the circumstances.

---

[172] *See* Amended Complaint [Docket 57], ¶ 17.
[173] Ex. 114.
[174] AS 45.01.215(a).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                     Page 40

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 40 of 54

## Quantum Meruit and Promissory Estoppel

66.     Midstate has pled both quantum meruit and promissory estoppel.[175]  Under both legal theories a party may assert that, although there is no express contract between the parties, there is at least an implied contract because to find otherwise would unjustly enrich the defendant.[176]  The remedy following success of either of these claims is restitution.[177]

67.     However, under Alaska law, where a party has acknowledged that a valid, binding contract between the parties exists, that party does not have a *prima facie* claim of promissory estoppel and therefore may not seek a remedy of quantum meruit.[178]

68.     There is no dispute that the parties had a valid and binding contract.  Midstate may not recover under either the theory of quantum meruit or the theory of promissory estoppel.

## Unfair Trade Practices

69.     Midstate has alleged:   "Ahtna's agreement and subsequent August 22, 2018 email confirming the same was made solely to induce Midstate's continued performance through the winter shutdown.  Ahtna never intended to meet

---

[175]  *See* Amended Complaint [Docket 57], ¶¶ 27–32.
[176]  *See Alaska Sales and Serv., Inc. v. Millet*, 735 P.2d 743, 746 (Alaska 2004); *see also Brady v. State*, 965 P.2d 1, 13 n.38 (Alaska 1998).
[177]  *See Alaska Sales and Serv., Inc.*, 735 P.2d at 746.
[178]  *See Soules v. Ramstack*, 95 P.3d 933, 940 (Alaska 2004); *see also Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 408 (9th Cir. 1992); *see also* 30 Williston on Contracts § 77:121 (4th ed. 2021) ("Where a benefit is conferred within the framework of a valid and enforceable contract, the recipient's liability to make compensation is fixed exclusively by the contract.").

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                           Page 41

Case 4:19-cv-00010-JWS     Document 184     Filed 08/17/21     Page 41 of 54

the terms of the agreement it made with Midstate or its August 22, 2018 email."[179] Midstate further argues that Ahtna's "deception" was a violation of Alaska's Unfair Trade Practices and Consumer Protection Act ("UTPA").[180]

70. Alaska Statute 45.50.471(b) identifies 57 specific unlawful acts or practices. This Court has previously observed that the only provision of the UTPA upon which Midstate can potentially demonstrate a violation is AS 45.50.471(a).[181] This provision generally prohibits unfair or deceptive acts or practices in the conduct of trade or commerce.[182]

71. Whether an act is "unfair" is determined using a "multi-factored approach," which considers: "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy, as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers."[183]

72. Ahtna's offer to stipulate to estimated truckload quantities, presented in Mr. O'Donnell's August 22 Email, was not an unfair act. Midstate has not demonstrated that the offer offended public policy. Midstate also has not

---

[179] Amended Complaint [Docket 57], ¶ 35.
[180] Amended Complaint [Docket 57], ¶ 37; AS 45.50.010 *et seq.*
[181] *See* Order Re: Motions at Dockets 64, 74, 92 [Docket 118], p. 18.
[182] *See also State v. O'Neill Investigators, Inc.*, 609 P.2d 520, 534 (Alaska 1980).
[183] *Merdes & Merdes, P.C. v. Leisnoi, Inc.*, 410 P.3d 398, 412 (Alaska 2017) (quoting *Borgen v. A &M Motors, Inc.*, 273 P.3d 575, 590 (Alaska 2012)).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*   Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                          Page 42

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 42 of 54

demonstrated that the offer was immoral, oppressive, or unscrupulous. It was not an act that caused or would cause substantial injury to consumers.

73. Moreover, Midstate is seeking enforcement of the terms described in the August 22 Email. Midstate cannot both seek enforcement of the offered terms and at the same time argue that the act of offering those terms was "unfair."

74. The remaining issue is whether the August Email was deceptive. An act or practice is deceptive if it has "the capacity or tendency to deceive."[184]

75. Whether an act is deceptive is fact-sensitive. At trial each party demonstrated it was a sophisticated business entity with substantial experience in the civil construction industry in Alaska. The Alaska Supreme Court has noted that an unfair trade practice is an "inequitable assertion of power or position" vis-à-vis the contracting parties.[185] It is therefore more difficult for Midstate to demonstrate that the email had a capacity or tendency to deceive than it would be if Midstate were not in a position equal to that of Ahtna.

76. This Court has previously acknowledged that the UTPA prohibits unfair or deceptive acts, but not unfair or deceptive *intentions*.[186] The inquiry is

---

[184] *Borgen*, 273 P.3d at 589; *see also Kenai Chrysler Center, Inc. v. Denison*, 167 P.3d 1240, 1255 (Alaska 2007).

[185] *Kenai Chrysler Center, Inc.*, 167 P.3d at 1256 (quoting *S. Atl. Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 539–40 (4th Cir. 2002)).

[186] *See* Order Re: Motions at Dockets 64, 74, 92 [Docket 118].

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                    Page 43
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 43 of 54

whether the August 22 Email was "capable of being interpreted [by Midstate] in a misleading way," regardless of what Ahtna intended at the time it sent it.[187]

77.     Midstate has not carried the burden of proving that the August 22 Email, standing alone, was capable of being interpreted in a misleading way. Midstate has only alleged that Ahtna "never intended to meet the terms of the agreement it made with Midstate or its August 22, 2018 email."[188] Again, Ahtna's intentions do not potentially constitute acts or practices in violation of the UTPA.[189]

78.     Turning to the language of the August 22 Email itself, the only specific language therein which Midstate identifies as capable of being interpreted in a misleading way are the words "this is final" at the conclusion of the email.[190] Midstate contends this language could be interpreted to mean that all future payments would be "final" and not interim.

79.     However, that is not what the email says. It says that the offer to "agree to the truckload measurement" is final, and makes no mention of payment at all.[191] Also, the parties presented extensive evidence of an acrimonious controversy between them regarding potential truckload measurements prior to the email, so it is

---

[187] *Kenai Chrysler Center, Inc.*, 167 P.3d at 1255 (quoting *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 535 (Alaska 1980)).
[188] Amended Complaint [Docket 57], ¶ 35.
[189] Even if Ahtna's intentions as to whether it would pay Midstate at the time of the August 22 Email were relevant, the evidence in the record is that Ahtna not only intended to pay Midstate according to the terms but actually did pay Midstate exactly according to the terms, at least prior to the December 2018 final payment. *See* Ex. 106, pp. 2–3.
[190] Ex. 54.
[191] Ex. 54.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                      Page 44

Case 4:19-cv-00010-JWS     Document 184     Filed 08/17/21     Page 44 of 54

reasonable to conclude that Mr. O'Donnell said "this is final" to indicate that he did not wish to discuss the matter further. That was his testimony at trial.[192]

80. In addition to not demonstrating that the email was objectively misleading, Midstate has not demonstrated that Mr. O'Donnell intended to mislead anyone in his email. There is no testimony proving insincerity on Mr. O'Donnell's part.

81. The closest Midstate can get to proof is an email sent by Mr. Champine to Midstate on August 10, 2018, identifying a variance between quantities placed versus stated truckloads.[193] Midstate says that Mr. Champine's knowledge of the variance shows Ahtna's motivation to pay by the truckload to induce continued performance and then "short-pay" after the season ended, knowing it would spend less in the end. However: (1) there are no communications between Mr. Champine and Mr. O'Donnell on this issue, and Mr. O'Donnell is the one that sent the "inducing" email; and (2) Mr. Champine shared the information with Midstate—it was hardly a conspiracy. If anything, it put Midstate on notice to expect a "true-up."

82. Midstate also has not demonstrated that it was *actually misled* by the email. Midstate argues that it was induced into "continued performance." However, Midstate's project manager, Mr. Karr, testified that Midstate never contemplated terminating its performance in the event that Ahtna did not deliver

---

[192] Tr. Vol. 4, p. 66 (D. O'Donnell) ("I don't want to go next week and go through this again, or the following week and go through it again.")

[193] Ex. 46.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*    Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law    Page 45

Case 4:19-cv-00010-JWS    Document 184    Filed 08/17/21    Page 45 of 54

acceptable terms to Midstate.[194] If Midstate were in fact contemplating terminating its performance, there is no evidence that it ever communicated this fact to Ahtna prior to the August 22 Email, thereby providing Ahtna a motivation to "induce" continued performance.

83. There also is an inconsistency in Midstate's argument that it was fraudulently induced into performance. Midstate has premised its claim of breach of contract on the plain language and legal enforceability of the August 22 Email. But a party may not try to recover a remedy on the basis of a contract and at the same time try to recover a separate remedy on grounds that it was fraudulently induced into agreeing with the terms of that same contract.[195]

84. Midstate has not demonstrated that delivery of the August 22 Email was an act or practice with the capacity or tendency to deceive. Ahtna did not violate the UTPA.

**Midstate Damages**

85. Midstate has alleged two categories of damages: (1) unpaid invoices; and (2) lost profit and overhead for work it would have performed in 2019 but for cancellation of further deliveries by Ahtna.[196]

---

[194] Tr. Vol. 2, pp. 127–28.

[195] The election-of-remedies doctrine "refers to situations where an individual pursues remedies that are legally or factually inconsistent" and operates to "prevent[] a party from obtaining double redress for a single wrong." *Latman v. Burdette*, 366 F.3d 774, 781–82 (9th Cir. 2004) (quoting *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 49 (1974)); *see also Bankers Tr. Co. v. Pac. Emps. Ins. Co.*, 282 F.2d 106, 110–11 (9th Cir. 1960).

[196] *See* Amended Complaint [Docket 57], p. 11.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                           Page 46

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 46 of 54

86.     Damages are recoverable following a breach of contract only in an amount that the non-breaching party can establish with reasonable certainty.[197]

87.     Midstate has not established the amounts due in its invoices with reasonable certainty.  This fact is evidenced by uncertainty from Midstate at trial as to the exact quantities and types of materials delivered and therefore the exact amounts allegedly due.

88.     At trial, Midstate acknowledged overbilling Ahtna.  Midstate also acknowledged having great difficulty establishing what it delivered to the Project and therefore what was due from Ahtna.  Consider Midstate's constant revisions to its invoices, one of which was made even in the middle of trial:

| Total Amount Claimed | Exhibit |
| --- | --- |
| $268,313.64 | Claim on Bond (Ex. 105) |
| $295,114.93 | Expert Report (Ex. AN) |
| $277,843.21 | Supplemental to Expert Report (Ex. 156) |
| $275,340.21 | Mid-Trial Report Supplemental (Ex. 171) |

89.     Explanatory notes in two of the exhibits referenced above acknowledge inaccuracies in the invoices, resulting in uncertainty on damages.[198]  Mr. Braham acknowledged at trial that part of the problem was Midstate sometimes billed

---

[197] *See* RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981); *City of Whittier v. Whittier Fuel and Marine Corp.*, 577 P.2d 216, 224 n.29 (Alaska 1978).
[198] Ex. 156; Ex. 171.

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law     Page 47

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 47 of 54

Ahtna for 27 CY of topsoil when the delivery was actually performed by a truck with much smaller capacity.[199]

90.     Another problem was poor recordkeeping by Midstate, which make it impossible to determine exactly what trucks delivered what materials. At trial, Midstate's expert economist testified that it is possible to arrive at exact amounts due by examining: "daily reports and truck tickets."[200] However, he also acknowledged that in some instances "the two documents don't agree with each other."[201]

91.     Midstate has not proved with reasonable certainty by a preponderance of the evidence the amounts which it alleges are due on account of unpaid invoices.

92.     The second category of damages sought by Midstate is lost profit and overhead for work it would have performed in 2019 but for cancellation of further deliveries by Ahtna.

93.     Midstate is only owed lost profit, including "reasonable overhead," if it can prove by a preponderance of the evidence that Ahtna's cancellation of deliveries for 2019 was a repudiation of the Purchase Order for which Ahtna had no legal excuse.[202]

---

[199] Tr. Vol. 3, p. 15 (J. Braham).
[200] Tr. Vol. 3, p. 81 (G. Moorehead).
[201] Tr. Vol. 3, p. 82 (G. Moorehead).
[202] AS 45.02.708. The UCC potentially entitles a non-breaching seller to "incidental costs" incurred by reason of the cancellation of further deliveries. *See* AS 45.02.710. However, Midstate is not seeking recovery of incidental costs. *See* Tr. Vol. 3, p. 91 (G. Moorehead).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                      Page 48
Case 4:19-cv-00010-JWS     Document 184     Filed 08/17/21     Page 48 of 54

94.     "An award of lost profits is not proper if it is the result of speculation."[203]  Lost profits must be proved with reasonable certainty.[204]  There must be a "reasonable basis" upon which a finder of fact can compute an award.[205]

95.     Midstate's expert economist calculated lost profits by calculating an anticipated hourly rate for each square yard of topsoil or woody debris Midstate planned to deliver in 2019, then multiplying that hourly rate by the amount of materials measured in-place following completion of the work by Ahtna in 2019.[206]  It is noteworthy that Midstate is using Ahtna's in-place measurement results, which it otherwise considers unreliable, as a reliable basis for calculation of its lost profit and overhead.

96.     Midstate's expert then calculated the anticipated "truckload quantities" that would actually be delivered by inflating those quantities beyond the quantities measured in-place.[207]  He reasoned that Midstate should have been paid for more than what was measured in-place in 2018, and therefore should also be paid for more than what was measured in-place in 2019.  He calculated that Midstate should receive profit and overhead according to an effective square yard unit price of $3.31

---

[203]  *Guard v. P & R Enters., Inc.*, 631 P.2d 1068, 1071 (Alaska 1981) (citing *Dowling Supply & Equip., Inc. v. City of Anchorage*, 490 P.2d 907, 909–10 (Alaska 1971)).
[204]  *See id.* at 1072.
[205]  *See City of Whittier v. Whittier Fuel and Marine Corp.*, 577 P.2d 216, 222 (Alaska 1978).
[206]  Ex. AN, p. 6.
[207]  Ex. AN, p. 7 (increasing "average square yards per load" from 96.23 and 94.68 to 121.5 and 120).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                              Page 49
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 49 of 54

per SY of topsoil and $3.30 per SY of woody debris, to address the insufficiency of payment on the basis of in-place quantities.[208]

97.    Midstate's basis for its calculation of lost profit and overhead is not reasonable.  There is no evidence that Ahtna ever agreed, or would agree, to effective unit prices of $3.31 per SY of topsoil and $3.30 per SY of woody debris. Midstate is only speculating that in-place quantities would have been an insufficient basis for payment in 2019, and Midstate is only speculating as to the degree of that insufficiency.

98.    Midstate's expert economist did not use historical job cost data when determining the expenses that would form Midstate's direct costs in 2019.[209] Instead, he used bid estimates and conversations with Mr. Karr.[210]  In construction accounting, the use of bid estimates in lieu of job cost data to establish damages is disfavored, because the latter is more reliable than the former.[211]

99.    Midstate has not used a reasonable basis for calculating its lost profit and overhead, and therefore has not demonstrated with reasonable certainty what that lost profit and overhead should be.

100.    Having determined that Midstate has not proved an entitlement to damages, it is unnecessary to address Midstate's claim to recover interest.

---

[208]  Tr. Vol. 3, pp. 89–90 (G. Moorhead).
[209]  Tr. Vol. 3, p. 93 (G. Moorehead).
[210]  Ex. AN, pp. 7–9.
[211]  *See Am. Line Builders, Inc. v. United States*, 26 Cl. Ct. 1155, 1181–82, 1193 (1992) (describing use of actual job costs as the "preferred" method for calculation of a contractor's damages).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                          Page 50
Case 4:19-cv-00010-JWS    Document 184    Filed 08/17/21    Page 50 of 54

## Ahtna Counterclaim: Breach of Contract

101.    Ahtna has alleged a breach of the Purchase Order by Midstate.[212]

102.    A breach of contract is a failure, without legal excuse, to perform any promise which forms the whole or part of a contract.[213]

103.    Ahtna alleges that the delivery of invoices billing Ahtna for nonexistent or misstated truckloads, and the demand for payment for square yards of materials in excess of the quantities measured in-place, constituted breach of the Purchase Order.

104.    Midstate's invoicing was a failure, without legal excuse, to perform the promise to bill Ahtna only for square yards of material actually delivered. Midstate breached the Purchase Order.

## Ahtna Counterclaim:  Unfair Trade Practices

105.    Ahtna has alleged that Midstate committed unfair trade practices, in violation of the UTPA.[214]

106.    The UTPA describes the following as an unfair or deceptive act or practice in the conduct of trade or commerce:  "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."[215]

---

[212] Ahtna Answer to Amended Complaint [Docket 58], p. 11.
[213] *Kimp v. Fire Lake Plaza II, LLC*, 484 P.3d 80, 89-90 (Alaska 2021) (quoting 23 Williston on Contracts § 63:1 (4th ed. 2018)).
[214] Ahtna Answer to Amended Complaint [Docket 58], p. 12.
[215] AS 45.50.471(b)(6).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                    Page 51
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 51 of 54

107.     The UTPA also describes the following as an unfair or deceptive act or practice in the conduct of trade or commerce:  "engaging in any other conduct creating a likelihood of confusion or of misunderstanding and that misleads, deceives, or damages a buyer or a competitor in connection with the sale or advertisement of goods or services."[216]

108.     Midstate was a seller of goods and Ahtna was a buyer of goods within the definitions of the UTPA.

109.     By representing that all its deliveries of woody debris contained material that met the Project Specifications, when they did not, Midstate violated the UTPA.

110.     By invoicing Ahtna for materials that it did not in fact deliver to the Project, and by representing that it delivered materials in quantities that were not in fact the actual quantities delivered, Midstate violated the UTPA.

### Ahtna Damages

111.     Although Ahtna has demonstrated by preponderance of the evidence that Midstate breached the Purchase Order, it did not demonstrate at trial any actual damages incurred by reason of the breach.  Ahtna is therefore awarded nominal damages of one dollar ($1.00).[217]

---

[216]  AS 45.50.471(b)(11).
[217]  *Galipeau v. Bixby as Tr. of Irrevocable Tr. of Rose E. Fong*, 476 P.3d 1129, 1134 n.13 (Alaska 2020) ("If the breach [of contract] caused no loss or if the amount of the loss is not proved . . .[,] a small sum fixed without regard to the amount of loss will be awarded as nominal damages." (second alteration original) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 346 (1981)).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                            Page 52
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 52 of 54

112. The UTPA provides that a person who suffers an ascertainable loss may bring a civil action to recover for each unlawful act or practice "three times the actual damages or $500, whichever is greater."[218]

113. There is no dispute between the parties that Midstate submitted to Ahtna at least two invoices for materials Midstate never delivered to the Project, and that Ahtna paid those invoices in full.[219] There is therefore no dispute that Ahtna has suffered an ascertainable loss by reason of Midstate's violation of the UTPA.

114. However, Ahtna did not proffer a calculation at trial of the exact amount it was overbilled by Midstate. Ahtna has not demonstrated its actual damages incurred due to Midstate's violation of the UTPA with reasonable certainty.

115. Because Ahtna has demonstrated that it suffered an ascertainable loss but has not demonstrated its actual damages, the Court orders an award of $500 in Ahtna's favor.

116. While Ahtna has demonstrated violation of both AS 45.50.471(b)(6) and AS 45.50.471(b)(11), Ahtna will not be awarded attorney's fees as the prevailing party because these state law counterclaims involved minimal time and effort as compared to the time and effort involved in defending against Midstate's Miller Act claims. Moreover, the defense of the Miller Act claims required consideration of facts intertwined with the counterclaims.

---

[218] AS 45.50.531(a).
[219] Ex. 170 (acknowledging overbilling on Invoice 1931 and Invoice 1940); Ex. 171 (acknowledging overbilling on Invoice 1931); Ex. 106, p. 2 (showing payment of Invoice 1931 in full); Ex. 106, p. 3 (showing payment of Invoice 1940 in full).

*Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al.*     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                                                    Page 53
Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 53 of 54

## IV.  DIRECTION FOR ENTRY OF JUDGEMENT

The Clerk is directed to enter judgment that Midstate recover nothing from Ahtna, and that Ahtna recover $501.00 from Midstate.  Ahtna may ask the Clerk to tax costs pursuant to 28 U.S.C. § 1920 and L. Civ. R. 54.1.

DATED this 17th day of August, 2021, at Anchorage, Alaska.

_/s/ John W. Sedwick_

JOHN W. SEDWICK
Senior United States District Judge

_Midstate Equip., Inc., et al. v. Ahtna Constr. & Primary Prods., LLC, et al._     Case No. 4:19-cv-00010-JWS
Findings of Fact and Conclusions of Law                                            Page 54

Case 4:19-cv-00010-JWS   Document 184   Filed 08/17/21   Page 54 of 54